1
                   UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK

2

3
---------------------------------X
                              :

4
JUAN MARTINEZ ROMERO,        :
                            :   16-CV-01239 (VMS)

5
            Plaintiff,   :
       v.               :

6
                            :   October 21, 2016
RUNG CHAROEN SUB INC., et al.,  :   Brooklyn, New York

7
           Defendants.   :

8
---------------------------------X

9

10
        TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
      BEFORE THE HONORABLE VERA M. SCANLON

11
        UNITED STATES MAGISTRATE JUDGE

12
APPEARANCES:

13
For the Plaintiff:         SHAWN R. CLARK
                      Michael Faillace & Associates

14
                      60 East 42nd Street, Suite 2540
                      New York, New York 10165

15

16
For the Defendant:         BINGCHEN LI, ESQ.
                      Law Office of Z. Tan PLLC

17
                      110 59th Street Suite 3200
                      New York, New York 10022

18
Spanish Interpreter:       EUGENE ALVAREZ

19
Thai Interpreter:          YODHIN MUTDHASTIRA

20

21

22
Court Transcriber:         MARY GRECO
                      TypeWrite Word Processing Service

23
                      211 N. Milton Road
                      Saratoga Springs, New York 12866

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

I N D E X

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR THE PLAINTIFF: | | | | | |
| Juan Martinez Romero | 22 | 37 | | | |
| | | | | | |
| WITNESSES FOR THE DEFENDANT | | | | | |
| Phimploy Likitsansook | | 50 | 59 | | |
| Kritikar Savaphapsakul | | 65 | 67 | | |
| Napaporn Likitsansook | | 70 | 73 | | |

| DEFENDANT'S | | PAGE |
|---|---|---|
| A | Sales Tax Form | 15 |
| B | 1099K | 15 |
| C | Pay Stubs | 15 |

3

1   (Proceedings began at 10:02 a.m.)

2              THE COURT:  All right.  We have everybody now?

3              MR. CLARK:  Yes, Your Honor.

4              THE COURT:  All right.  So this case is <u>Martinez</u>

5   <u>Romero v. Rung Charoen Sub, Inc.</u>, 16-CV-1239.  So let's first

6   start with everyone's appearance.  So on behalf of the

7   plaintiff?  You can stay seated when you're speaking.  If you

8   could use the microphones, it will be helpful.  And you know

9   that they're on because the green light is on on the base.

10             MR. CLARK:  Shawn Clark from Michael Faillace &

11  Associates for the plaintiff.  Also at counsel's table is a

12  paralegal from my office, Mr. Umberto Alvarez; the plaintiff

13  in the case, Mr. Juan Martinez; and then also a certified

14  translator of Spanish, Eugene Alvarez who will be assisting

15  us.

16             MR. LI:  For defendants, Bingchen Li of the Law

17  Office of Z. Tan PLLC.  Also with me is the Thai interpreter

18  and plaintiff Phimploy Likitsansook and Kritikar

19  Savaphapsakul.  Phimploy Likitsansook is representing the

20  corporation as well.

21             THE COURT:  Okay.  All right.  If you could tell me

22  the translator's name?  I have your card already, Mr. Alvarez,

23  so let's just --

24             MR. ALVAREZ:  Thank you, Your Honor.

25             MR. MUTDHASTIRA:  The Thai interpreter is --

4

1          THE COURT:  If you don't mind, you can have a seat.

2   Just use the microphone.

3          MR. MUTDHASTIRA:  Oh, thank you.  The first name is

4   Y-O-D-H-I-N.  The last name is M-U-T-D-H-A-S-T-I-R-A, Thai

5   interpreter.

6          THE COURT:  Okay.  Let me just make sure.  Hold on a

7   second.  I just want to make sure.  The other two folks in the

8   room, are they witnesses?

9          MR. LI:  Yes, Your Honor.  One is James Lam who we

10  identified in the pre-trial order in defendant's submission.

11  He's the accountant for the corporation and he's going to lay

12  the foundation for all the documents that we are going to

13  submit into evidence even though Mr. Shawn Clark just told me

14  that he is going to stip to admit those documents.  The other

15  lady there is -- his name is Napaporn Likitsansook and we

16  would like to make an application, defendants would like to

17  make an application to use her as a witness as well.  The

18  reason that we didn't include her in our pre-trial

19  submissions, not until yesterday did we know that she has

20  relevant information, specifically the hours that the

21  plaintiff worked at the restaurant.

22          THE COURT:  I'm sorry, tell me her name again?

23          MR. LI:  Her name is Napaporn Likitsansook.  She's

24  the daughter of Phimploy Likitsansook.  Spelling is N-A-P-A-P-

25  -O-R-N, L-I-K-I-T-S-A-N-S-O-O-K.

5

1          THE COURT:  I'm sorry, one more time.  L-I --

2          MR. LI:  It's the same as Phimploy Likitsansook.

3   L-I-K-I-T-S-A-N-S-O-O-K.

4          THE COURT:  Okay.  All right.  So in general the

5   witnesses shouldn't be in the room unless they're parties.  So

6   any reason why they should stay until they're ready to

7   testify?

8          MR. LI:  They're ready to testify.

9          MR. CLARK:  Your Honor, I would agree.  Plaintiffs

10  move to exclude any non-party witnesses from the courtroom

11  till testimony in the trial.

12         THE COURT:  All right.  Any position?  I'm just

13  going to have them wait next door.  There's a room next door.

14         MR. LI:  Okay.  But can we go with them first or --

15         THE COURT:  We'll talk about that in one second.

16  They shouldn't be here for that discussion.

17         MR. LI:  Okay.  All right.

18         THE COURT:  All right.  So I'm just going to ask you

19  to wait.  There's a conference room next door.  Okay.  So for

20  both of the witnesses, if you can wait next door.  Thanks.

21         All right.  And then let's just swear in the

22  interpreters.  So Mr. Alvarez and Mr. Mutdhastira, each of

23  you, if you could raise your right hand.

24         (EUGENE ALVAREZ, SPANISH INTERPRETER, SWORN.)

25         (YODHIN MUTDHASTIRA, THAI INTERPRETER, SWORN.)

6

1    THE COURT:  Okay.  And just for the record, if you

2  could state your name again?  Please state your name.  No,

3  you.  The translator.  You yourself.

4    MR. MUTDHASTIRA:  Yodhin Mutdhastira, Your Honor.

5    THE COURT:  Okay.  And are you a certified court

6  interpreter?

7    MR. MUTDHASTIRA:  Yes, Your Honor.

8    THE COURT:  All right.  Thank you.  You can have a

9  seat.  Okay.

10    Just for the logistics for the translators, are you

11  in a good position in relation to your respective clients?

12    MR. MUTDHASTIRA:  Yes, I'm comfortable.

13    THE COURT:  If you need to move around, you should

14  feel free to.  And if you need anybody to slow down while

15  we're doing the trial, you should just let me know.  Okay?

16    MR. ALVAREZ:  Thank you for asking, Your Honor.  I

17  am comfortable in the position I am.  Thank you very much.

18    THE COURT:  All right.

19    MR. ALVAREZ:  And it is a privilege to appear before

20  your court, Your Honor.

21    THE COURT:  Thank you.  All right.  So in terms of

22  the order of the witnesses, I'm not sure what you're thinking.

23  I have your respective letters.  It seems like there's two

24  issues.  One, what order to do them given the two non-party

25  witnesses are already here in the morning.  And two, if

7

1   there's any issue with Napaporn Likitsansook testifying.

2         MR. CLARK: Yes, Your Honor. We certainly oppose

3   their testimony. If you recall in this particular case, there

4   was a dispute about how to handle the remaining discovery

5   schedule in the case and it was agreed that rather than

6   dealing with the minutia of discovery we would agree that the

7   entire set of evidence that existed at the time would be the

8   full scope of the evidence. Even beyond that, it's typical

9   even in a case that has been fully worked up that at the very

10   latest you would have an idea of the full universe of

11   witnesses at the filing of the joint pretrial order or when

12   the witness list was due. Here, and even this person was

13   never identified in the witness list. They are related to the

14   defendant in the case. There's no reason that has been

15   presented to me that presents a compelling reason why they

16   should not have known this information not just when the

17   witness list was due but in fact many months ago. Given the

18   fact that this has only really been introduced to me today, I

19   don't think that we should be ambushed with a surprise witness

20   on the day of trial.

21         MR. LI: Your Honor, please allow defendant to add

22   that when Mr. Shawn Clark characterized it as a surprise

23   actually issue wise there's not really any surprise.

24   Defendant can stipulate not to allow this particular new

25   witness to testify to anything beyond the scope we defined in

8

1   the pretrial submission from defendants.  Actually, the only

2   reason that she is here is just to testify for the defense of

3   the plaintiff's hours, specifically when he arrived at the

4   restaurant and when he departed from work.  While she was

5   working there she had a personal knowledge as to the

6   plaintiff's hours in the restaurant.  I think it's in the

7   interest of judicial fairness that you allow this particular

8   witness to testify.  Specifically, it's not beyond the scope

9   of any submission from defendant.

10              THE COURT:  Okay.  So what's her relationship to any

11  of the parties?

12              MR. LI:  Okay.  She's the daughter of Napaporn

13  Likitsansook and I believe she's really -- one of the reasons,

14  I wouldn't say the only reason because we were not notified

15  that she had any personal knowledge relevant to this case but

16  one of the reasons was because she was young, she was not

17  involved in entire lawsuit because she is not a party and she

18  was in school in Boston.  Yes, she worked in the restaurant

19  after she graduated from school but we didn't know that she

20  had any relevant information until yesterday.

21              THE COURT:  All right.  Well, you didn't know but

22  that doesn't mean your client didn't know, right?

23              MR. LI:  That's correct but when my client testify

24  you will find out that my client actually is not a very

25  sophisticated person.  She only finished fourth grade,

9

1  elementary school, and she is a chef for her entire career.

2  And she, by any means of stretch, you wouldn't call him

3  sophisticated.  Probably a slicker mind.  Probably she never

4  thought of bring her daughter into this type of settings which

5  a lot of people who do not have high education may be afraid

6  of to shed some bad light on the daughter if the daughter

7  appears in the court.  So for whatever reason I cannot explain

8  at this moment, maybe my client is better equipped to explain

9  this to Your Honor, but we were not aware that she had any

10 relevant information until yesterday.

11        THE COURT:  All right.  What about the point that

12 plaintiff's counsel is making that basically you all decided

13 to not do much exchange of discovery and just go right to

14 trial?  So that was based on an understanding of who the

15 likely witnesses are going to be.  And that's obviously

16 changing.  So how come you should be allowed to change gears

17 now?

18        MR. LI:  Again, Your Honor, we are not trying to

19 expand, not even marginally trying to expand the scope of our

20 arguments.  It's consistent, well within the scope of what

21 defendant wants to prove that the hours put up by plaintiff's

22 complaint is, to say the least, is not entirely accurate but

23 actually it's well, well off to the real -- what really

24 actually happened.  So we urge the Court to allow defendant to

25 use additional witness just to prove that the plaintiff is not

1  being very accurate in his complaint regarding his hours and

2  working at the restaurant.

3            THE COURT:  All right.  Back to the plaintiff.

4  What's the prejudice?  I mean nobody did any discovery in

5  terms of depositions in this case.

6            MR. CLARK:  Your Honor, nobody did depositions or

7  additional discovery based on the idea that we would know

8  exactly what the evidence and exactly who the witnesses in

9  this case were going to be.  At the time --

10           THE COURT:  Well, you're talking about two weeks out

11  meaning when the letters were submitted or when you --

12           MR. CLARK:  Well, I believe at our final conference

13  we made clear that the idea behind scheduling the trial was

14  because we weren't going to be doing additional discovery,

15  that there would not be a summary judgment motion filed and

16  that would be going in with the evidence that had been

17  exchanged up to that date.  Certainly I think that this is an

18  experiment of sorts with that idea and certainly I would never

19  ever do that again given what my position is right now being

20  ambushed, and I don't know a better word for it, with an

21  additional witness who apparently knows essential information

22  about the relevant matters of the claim.

23           THE COURT:  Right.  Let me just -- I'm sorry.  Were

24  any of these folks deposed at all?

25           MR. CLARK:  None of the witness have been deposed.

1          THE COURT:  All right.  She can testify.  But if you
2   need time to prepare, this is a bench trial, we can continue
3   it on another day.  She's going to have to come back to
4   testify.  So see how it goes.  You can think about it.  She
5   should stay around for a while.  You can let me know if you
6   want to do it today, if you want to do it another day.  If
7   you're going to offer her, she has to come back.  All right.
8   What about Mr. Lam?
9          MR. LI:  Mr. Lam was identified in the defendant's
10  pretrial documents.  I don't know if Mr. Shawn Clark had any
11  objection to --
12         MR. CLARK:  Yeah.  At the last conference it was
13  clear that there would be someone who would be bringing in the
14  tax returns.  So I have no issue with that.  That was very
15  clear from the beginning that the individual defendants and
16  then potentially some sort of financial professional would be
17  testifying.
18         THE COURT:  You mentioned you may have an agreement.
19  Does he need to testify is my question?  Can he testify out of
20  order?  What's the issue?
21         MR. CLARK:  I said I would stipulate to the tax
22  returns coming in partially because that could alleve the need
23  of them testifying.  I think Mr. Li thinks that there could be
24  some sort of potential use of the testimony at this time.  I
25  would leave it to him really.

1          And that does lead to another issue which we need to

2    discuss which is I think that defendants -- and this is my

3    mistake too.  When we were putting together our witness list

4    that we contemplated testimony by declaration which I

5    understand --

6               THE COURT:  Yes, that was my next question.

7               MR. CLARK:  -- is not something used typically in

8    the eastern district, and I know that.

9               THE COURT:  Okay.  Well, hold on.  What about Mr.

10   Lam?  Do you need him?  Does he need to testify?

11              MR. LI:  Your Honor, can you allow me a few minutes?

12   I need to talk to Ms. Lam.

13              THE COURT:  All right.  You can talk to him a

14   second.  Hold on, hold.  All right.  What about the -- so do

15   you have declarations?

16              MR. CLARK:  I, after reviewing Your Honor's

17   individual rules and your individual rules did not contemplate

18   testimony by declaration, I prepared my witness to do direct

19   testimony live.  I believe defense counsel contemplated using

20   declaration.

21              THE COURT:  Is that right?

22              MR. LI:  I have all the declarations.

23              THE COURT:  Okay.  All right.  Do you want to take -

24   - how long do you need to talk to Mr. Lam?

25              MR. LI:  Only two minutes.

13

1          THE COURT:  All right.  We're just going to go off

2   the record.

3   (Off the record at 10:17 a.m.)

4   (Back on the record at 10:21 a.m.)

5          THE COURT:  Okay.  Back on the record.  So where

6   were we with Mr. Lam?

7          MR. LI:  Your Honor, if plaintiffs stip to admit all

8   the exhibits, Defendant A, B, and C, I think C is the same as

9   the Plaintiff Exhibit 1, defendant would not call James Lam.

10          THE COURT:  I don't have all the documents, just so

11  you know.  But okay.  Thanks.  All right.  So we're talking

12  about --

13          MR. LI:  The tax returns for the use of sales tax

14  returns.

15          THE COURT:  I'm sorry.  First, stick with the

16  microphone.

17          MR. LI:  I'm sorry.

18          THE COURT:  Unfortunately, this is not a well miked

19  courtroom so you have to be near a microphone.

20          MR. LI:  It's the New York State and the local sales

21  and use tax file return.  The filing period is December 1,

22  2013 until I believe November 30th.

23          THE COURT:  And what exhibit it is?

24          MR. LI:  2015.  That's Defendant's Exhibit A.

25          THE COURT:  Okay.

1           MR. LI:  And also there are Defendant Exhibit B

2    which is a single sheet of paper.  It's a 1099K.  I mean as

3    long as the plaintiff is stipulating these are the filing true

4    correct copy of defendant Rung Charoen Sub, Inc., defendant

5    will not call James Lam CPA to lay the foundation for these

6    documents?

7           THE COURT:  What's the plaintiff's position?

8           MR. CLARK:  I would stipulate to the admission of

9    those documents.

10          THE COURT:  All right.  So we've got Defendant's A

11   and Defendant's B.  All right.  Anything else?

12          MR. CLARK:  And I think C is the same as --

13          MR. LI:  C is the same as [inaudible].

14          THE COURT:  Same?  I'm sorry, the same time.  You

15   got to move the microphones.

16          MR. CLARK:  My apologies.  Defendant's C is the same

17   as Plaintiff's 1 so I'd also be willing to stipulate to the

18   admission of that document.

19          THE COURT:  Okay.  So Defendant's C?

20          MR. CLARK:  Yes.

21          THE COURT:  Which is also Plaintiff's 1.  All right.

22   So is this correct you're in agreement that A, B, and C can be

23   admitted into evidence?

24          MR. CLARK:  That is correct, Your Honor.

25          THE COURT:  And that's what, the defendant's side,

15

1   that's what you'd like?

2           MR. LI:  Yes, Your Honor.

3           THE COURT:  They're admitted.

4           (Defendant's Exhibits A, B, and C Received.)

5           THE COURT:  All right.  So we don't need Mr. Lam?

6           MR. LI:  No.

7           THE COURT:  All right.  So why don't you tell him

8   that he can leave?

9           MR. LI:  Yes, I told him already.

10           THE COURT:  Okay.  All right.  We've also got the

11  additional witness testifying today or this afternoon.  I'd

12  just like to give her a sense.  Does she need to stay, come

13  back this afternoon?

14           MR. LI:  I just wanted to take a look at her

15  declaration --

16           THE COURT:  Sure.

17           MR. LI:  -- very quickly to see if I'm going to need

18  any additional time.

19           THE COURT:  All right.  We'll go off the record

20  again.  Let me know when you're ready.

21  (Off the record at 10:24 a.m.)

22  (Back on the record at 10:25 a.m.)

23           MR. CLARK:  Material.  I'd want to confer with my

24  client concerning.  So I don't know, depending on the flow of

25  the day, I imagine I could probably do that within the space

16

 1   of a lunch break.  So depending on how testimony goes, if we

 2   have a clear ending point, noon or 1 or something like that, I

 3   could potentially be in a position to call her after that

 4   period.

 5            THE COURT:  Okay.  So what's your estimate on how

 6   long your client's testimony will be?

 7            MR. CLARK:  Probably only like an hour maximum.

 8   It's a fairly straightforward case.

 9            THE COURT:  Again, that takes into account there's a

10   translator?

11            MR. CLARK:  Yes, Your Honor.

12            THE COURT:  Some time a little bit longer.  Okay.

13   So that's about 11:30 or so.  Then your cross.  And how about

14   your client's testimony?

15            MR. LI:  Your Honor, so we have a choice.  Do you

16   want to admit the trial declarations for all parties, all

17   defendants, as well as the witness?  Or you prefer us to do

18   direct?

19            THE COURT:  What's your -- I'm fine with taking

20   their direct testimony by declaration but how about on your

21   side?

22            MR. CLARK:  I'd be fine with it I think.

23            THE COURT:  Okay.  So then it's really -- hold on

24   one second.  Your cross, what's your estimate?  This is just

25   to get an estimate about when --

1          MR. CLARK:  It should be pretty short in this case.

2     I don't anticipate lengthy crosses on my part.

3          THE COURT:  Okay.  So I would say we would probably

4     take a break at 12:30 and an hour for lunch, so if you need a

5     little more time, that's fine.  Your witness, I mean she's

6     welcome to stay there, or there's a cafeteria, but she should

7     plan to be back here ready to testify at 1:30.  Okay?  All

8     right.  So you had a housekeeping issue.  Was it just those

9     declarations?

10          MR. LI:  No, I just wanted to submit the

11     declarations.

12          THE COURT:  Okay.  That's fine.  And you have

13     copies, Mr. Clark?

14          MR. CLARK:  Yes, Your Honor.

15          THE COURT:  Okay.  So we have a trial declaration of

16     Phimploy Likitsansook, the trial declaration of Kritikar --

17     I'm not sure how to say your client's -- how do you say your

18     client's last name?

19          MR. LI:  Kritikar -- can you help me just how to say

20     your name?

21          MS. SAVAPHAPSAKUL:  Kritikar Savaphapsakul.

22          THE COURT:  Savaphapsakul.  We have her declaration.

23     Okay.  And there's a third -- okay.  And then the other

24     witness, Napaporn Likitsansook is going to testify after

25     lunch.  All right.  But I guess she's welcome to stay if she

1    wants.  The weather is not nice outside so -- okay.  So on the

2    plaintiff's side, well let's just ask, do either side -- do

3    you want to make an opening statement?  Just to go back on

4    where we were, just you know, I'm happy to take the testimony

5    and then have you make a submission after that to summarize

6    everything.  But if you would like to say something now you're

7    welcome to.  So plaintiff's side?

8              MR. CLARK:  I think in lieu of having openings and

9    closings that just having post trial filings or proposed

10   findings of fact and conclusions of law would be the easiest.

11             THE COURT:  All right.  How about on defendant's

12   side?

13             MR. LI:  Your Honor, so just to -- in order to

14   expedite the process, I would like to ask to go off the

15   record.  I want to discuss with plaintiff's counsel, maybe see

16   what we -- where we differ in this particular case.  Then we

17   can focus on these specific issues instead of just going all

18   fronts while we actually -- there's not much difference there.

19   So we just want to take maybe five minutes to discuss to that

20   end.

21             THE COURT:  Okay.  If you think you might stipulate

22   to certain things, is that the idea?

23             MR. LI:  Yes.

24             THE COURT:  All right.

25             MR. CLARK:  I'd be hoping that, it's just the hour

1   is late, but I'm willing to talk about it.

2         THE COURT:  Sure.  Go ahead.  We're off the record

3   again.  Why don't you all talk?

4   (Off the record at 10:29 a.m.)

5   (Back on the record at 10:36 a.m.)

6         THE COURT:  Move things along.  Okay.

7         MR. CLARK:  I could potentially move things along.

8         THE COURT:  Okay.

9         MR. CLARK:  And we're on the record, right?

10        THE COURT:  Yes, we're on the record now.

11        MR. CLARK:  We have stipulated that the plaintiff

12  was an employee of the subject restaurant 8 Paet Rio; that the

13  defendant, Ms. Phimploy Likitsansook was a FLSA employer.  We

14  have stipulated that Juan Martinez Romero would begin at 11

15  a.m. in the morning for those days that he worked.  We have

16  stipulated that the plaintiff never received a wage notice in

17  writing upon changing rates or beginning his employment.  We

18  have also stipulated that he did not receive a formal wage

19  notice.  Wage statement, my apologies.  We have stipulated

20  that he was paid $100 a day in a combination of cash and check

21  for every day that he was employed.  And we have also

22  stipulated that for every day that he worked he was entitled

23  to spread of hours pay.

24        THE COURT:  Okay.  How about dates of employment?

25        MR. LI:  Your Honor, just one comment.

20

1          MR. CLARK:  There's still a dispute about those.

2          THE COURT:  Okay.

3          MR. LI:  Your Honor, just one comment then.  Mr.

4    Clark said he never received the wage statement.  Actually,

5    the pay stub, you can interpret it as wage statement even

6    though it may not be very accurate.  So --

7          MR. CLARK:  Okay.  I thought that was my

8    understanding.  Well, the thing is we're still -- could we go

9    off the record for one moment?

10         THE COURT:  Yes.  Let us know.  Yes.

11   (Off the record at 10:37 a.m.)

12   (Back on the record at 10:38 a.m.)

13         MR. CLARK:  Okay.  To clarify, I believe that the

14   substance of our stipulation is that the plaintiff never

15   received a wage statement in the form required by Section 195

16   of the New York Labor Law.

17         THE COURT:  Okay.  All right.  So where does that

18   leave us in terms of what the witness you think should testify

19   to this afternoon, Ms. Napaporn?  She's still going to

20   testify?

21         MR. CLARK:  I think she still needs to because there

22   are still disputes I think both about the date of hiring which

23   I don't think is a huge dispute but it's a dispute.  And then

24   I do think that there is a dispute over the hours worked.

25         THE COURT:  Okay.  So it's about 10:30.  So what I

1  proposed earlier is we'd go for about two hours.  You have an

2  hour lunch, and we pick up.  Does that make sense?  Does that

3  work?

4         MR. CLARK:  Yes, Your Honor.  I'm hoping --

5  certainly I prepared my direct examination under the theory

6  that I need to prove some of these things we ended up

7  stipulating to.  So I'm going to be trying to cut as much as I

8  can.

9         THE COURT:  We have the day.  Okay.  I just don't

10  want her -- is she still here?

11         MR. LI:  Yes, she's still here.

12         THE COURT:  Okay.  I mean does that sound right for

13  her to be ready at 1:30 or should it be something different?

14         MR. CLARK:  I hope so.  I don't think any later than

15  that.

16         THE COURT:  Okay.  Not earlier, right?  Okay.  1:30.

17         MR. LI:  Okay.

18         THE COURT:  All right.  Okay.  Is everybody ready?

19  All right.  So for the plaintiff, call your first witness.

20         MR. CLARK:  The plaintiff calls the plaintiff, Mr.

21  Juan Martinez Romero to the stand.

22         THE COURT:  All right.  Mr. Romero, come on up here.

23      (JUAN MARTINEZ ROMERO, PLAINTIFF'S WITNESS, SWORN)

24         THE COURT:  Thank you.  You can have a seat.  Can

25  you state and spell your name for the record, please?

```
                    Romero - Direct                        22
```

 1              THE WITNESS:  Juan Martinez Romero.

 2              THE COURT:  All right.

 3              MR. CLARK:  Your Honor, would you prefer I use the

 4      podium or just --

 5              THE COURT:  We don't have a microphone over there.

 6      So if you want to move around the table, if it's easier for

 7      you to maybe sit on the other side and face -- whatever is

 8      comfortable.

 9              MR. CLARK:  That actually might -- I think I can

10      actually --

11              THE COURT:  If you want to sit on that side so

12      you're looking at your client, that's fine.

13              MR. CLARK:  Yeah, I think that might be helpful.

14              THE COURT:  Sure.

15                       DIRECT EXAMINATION

16      BY MR. CLARK:

17      Q.    Good afternoon, Mr. Martinez.

18      A.    Good afternoon.

19      Q.    How old are you?

20      A.    50 years old.

21      Q.    And what's the highest education that you've received?

22      A.    Secondary.

23      Q.    And what is your primary language?

24      A.    Spanish.

25      Q.    And can you read in Spanish?

```
                    Romero - Direct                     23
```

1    A.    Yes.

2    Q.    And can you write in Spanish?

3    A.    Yes.

4    Q.    Do you speak English?

5    A.    No.

6    Q.    And can you write in English?

7    A.    No.

8    Q.    And can you read in English?

9    A.    No.

10   Q.    And what do you presently do for a living?

11   A.    Working.

12   Q.    And what kind of work do you do now?

13   A.    I deliver food.

14   Q.    And have you ever worked for a restaurant called 8 Paet

15   Rio?

16   A.    Yes.

17   Q.    And what is 8 Paet Rio?

18   A.    A Thai restaurant.

19   Q.    And what's the address of 8 Paet Rio?

20   A.    8110 Broadway in Elmhurst, New York.

21   Q.    And when did you first find your job at 8 Paet Rio?

22   A.    Towards the latter part of June '14.

23   Q.    Did you say the year?  Could you state the year?

24   A.    It was 2014.

25   Q.    Okay.  And how did you find your job at 8 Paet Rio?

```
                    Romero - Direct                      24
```

1   A.   I met the owner.

2   Q.   And how did you meet the owner?

3   A.   I worked with them in Manhattan.

4   Q.   And who are the owners?

5   A.   The lady that is here and there present and her husband.

6   Q.   And what's her name?

7   A.   Phimploy.

8        THE COURT:  Just when you say she's present, you

9   mean in the courtroom?

10       THE WITNESS:  Yes.

11       THE COURT:  All right.  Is she sitting at the

12   defendant's table?

13       THE WITNESS:  Yes.

14       THE COURT:  Can you identify any particular item of

15   clothing so we would know which of the individuals seated at

16   the table is the person you're referring to?

17       THE WITNESS:  The one with the black sweater.

18       THE COURT:  All right.  So for defendants, counsel,

19   can you just have your client who's wearing a black sweater to

20   say her name for the record?

21       MS. LIKITSANSOOK:  Phimploy Likitsansook.

22       THE COURT:  All right.  So the person that the

23   witness has identified as the owner has just said her name on

24   the record.  All right.  You can keep going for the plaintiff.

25   Q.   And what job were you offered at 8 Paet Rio?

```
                    Romero - Direct                    25
```

1   A.   Deliveries.

2   Q.   And did Phimploy describe what tasks you would be doing

3   as a delivery worker?

4   A.   Yes.  Delivering food and cutting vegetables and cutting

5   meat.

6   Q.   And were you told anything else when you were first

7   hired?

8   A.   No.

9   Q.   Were you told what days of the week that you were going

10  to be needed for this job at 8 Paet Rio?

11  A.   No.

12  Q.   Were you told what your schedule was going to be when you

13  were initially hired at 8 Paet Rio?

14  A.   From 11 to 11.

15  Q.   And when you actually started working at 8 Paet Rio did

16  you find what days of the week you would be required to work?

17  A.   No.

18  Q.   Well, at some point you discovered how many days you'd

19  need to be at the restaurant, right?

20  A.   Yes.

21  Q.   And how many days would you be working at the restaurant

22  in a typical week right after you were hired?

23  A.   Seven days.

24          THE COURT:  I'm sorry, did you establish when he

25  started working?

Romero - Direct                                              26

1          MR. CLARK:  I believe he testified earlier as to

2    when he was -- oh, he testified when he was hired.

3    Q.    When did you start working?

4    A.    Towards the latter part of June.

5    Q.    Of when?

6    A.    Of 2014.

7    Q.    Okay.  And when you were working seven days a week, right

8    after you started working, what were the hours that you were

9    actually working?

10   A.    From 11 and sometimes I would work till 12 midnight or 1

11   o'clock of the next morning.

12   Q.    And how often would you estimate that you worked until 1

13   o'clock the next morning?

14   A.    It was two or three times per week.

15   Q.    And separate from those days where you worked until 1,

16   how many days a week were you working until midnight?

17   A.    The same.  Some four or three times per week.

18   Q.    Now, did there ever come a time where you began working

19   less than seven days a week?

20   A.    On some occasions.

21   Q.    Okay.  But it wasn't a formal change in your schedule.

22   Withdrawn.  Was that a formal change in your schedule or just

23   an occasional thing?

24   A.    Only when I would get sick.

25   Q.    And the schedule that you described right after you

                    Romero - Direct                    27

1   started working, was that your schedule through your entire

2   time at 8 Paet Rio?

3   A.    No.   That was only for about a year?

4   Q.    And then what happened?

5   A.    Then afterwards only to 11:30, 11:15.

6   Q.    And was that the case until the end of your employment?

7   A.    Yes.

8   Q.    And for those periods where you worked after 11 p.m.,

9   what were you doing?

10  A.    Waiting until the lady would finish cooking so I could

11  clean the kitchen.

12  Q.    Anything else?

13  A.    No.

14  Q.    And when you say the lady, who do you mean?

15  A.    To the owner.

16  Q.    And do you mean Phimploy or someone else?

17  A.    To Phimploy.

18  Q.    Now, we talked a little bit earlier about how your tasks

19  were described to you before you started 8 Paet Rio.  Do you

20  remember that?

21  A.    Cutting meat, cutting vegetables, washing dishes,

22  cleaning seafood and cleaning the kitchen.

23  Q.    And were those actually your tasks when you started

24  working at 8 Paet Rio?

25  A.    Well, I only went there as a delivery person.

```
                    Romero - Direct                     28
```

1   Q.   Okay.  To clarify then, after you started working at 8

2   Paet Rio, that's when you started performing the tasks that

3   you just described?

4   A.   Deliveries, cutting vegetables, cutting meats, washing

5   dishes, cleaning seafood.

6   Q.   And when did you start doing all of those activities?

7   A.   From the beginning.

8   Q.   And were those what you did at the restaurant for the

9   entire time of your employment?

10  A.   Yes.

11  Q.   And is there anything else that you started doing in the

12  middle of your employment that you haven't already talked

13  about with us?

14  A.   No.

15  Q.   And when you started working out El Economico, did you

16  have to write down yourself exactly when you started in the

17  morning?

18            THE COURT:  Wait.  El Economico?

19            MR. CLARK:  Oh, my God.  8 Paet Rio.

20            THE COURT:  All right.

21  A.   No.

22  Q.   And when you started working at 8 Paet Rio did you have

23  to record yourself exactly when you left at the end of each

24  day?

25  A.   No.

```
                    Romero - Direct                      29
```

1    Q.   Did there ever come a time that you yourself had to start

2    recording exactly when you came in or left at the end of the

3    day?

4    A.   No.

5    Q.   And you were paid for your work at 8 Paet Rio, right?

6    A.   Yes.

7    Q.   And at the beginning of your employment what were you

8    told you were going to be paid?

9    A.   $100 per day.

10   Q.   And in what form were you paid that?  Cash, check,

11   something else?

12   A.   Part by check and part in cash.

13   Q.   And do you receive anything when you received your pay?

14   A.   No.

15   Q.   But do you ever get a pay stub or a check stub when you

16   received your pay?

17   A.   The pay stub from the check.

18           MR. CLARK:  Okay.  Now, Your Honor, I was going to

19   show him Plaintiff's Exhibit 1.  I know Defendant's Exhibit C

20   is the same content and is already in admission.  So I'll show

21   my adversary Plaintiff's Exhibit 1 just so that he can confirm

22   that it's the same document.

23           THE COURT:  Okay.

24           MR. CLARK:  I think I'll go forward with Plaintiff's

25   1 [inaudible].

```
                    Romero - Direct                    30
```

1              THE INTERPRETER:  Your Honor, can I be allowed -- I

2     left my glasses there on the table.

3              THE COURT:  Sure.  Yes.

4     Q.    Do you recognize the document that I just handed you?

5     A.    Yes.

6     Q.    And what is it?

7     A.    Those are the stubs from the checks.

8     Q.    Now, I just want to turn you to -- and I apologize that

9     with this printout it looks really tiny.  Do you see the small

10    gray box on the bottom of the check that says plaintiff

11    000001?

12    A.    Yes.

13    Q.    Can you please turn to the Plaintiff 23?  Should be the

14    23rd page.  And tell me when you're at that page.  If it's also

15    helpful, it is dated 4/19/2015.

16             THE INTERPRETER:  '14?

17             MR. CLARK:  2015.

18    Q.    It is Plaintiff 23 and it is dated 4/19/2015.

19    A.    Is it 04/12/2015?

20    A.    It's 4/19/2015.

21             MR. CLARK:  Would it be okay if I went up to assist

22    the witness?

23             THE COURT:  Sure.

24    Q.    Now, do you see some handwriting on this page?

25    A.    Yes.

                    Romero - Direct                          31

1   Q.    Do you know who wrote that?

2   A.    The owner, female.

3   Q.    And when you say the owner, female, do you know what's

4   her name?

5   A.    Phimploy.

6   Q.    And what does this handwriting mean?

7   A.    The amount of what they paid me.

8   Q.    And paid you in what?

9   A.    There they did an addition form to divide the part that

10  was going to be paid by check and the parts that were going to

11  be paid in cash.

12  Q.    And what was the total amount of pay that you received

13  this for?

14  A.    700.

15  Q.    Now, I'm going to ask you to just move a couple of pages

16  forward to Plaintiff 25.  That should be dated June 4, 2015.

17          MR. CLARK:  May I approach the witness, Judge?

18          THE COURT:  Yes.  Which page?

19          MR. CLARK:  Plaintiff 25 dated June 4, 2015.

20          THE COURT:  Okay.  Thanks.  I just need the

21  translator stay close to the microphone.  Thanks.

22  Q.    Now, do you see the handwriting that says 500 on this

23  piece of paper?

24  A.    Yes.

25  Q.    And what does the 500 mean if you know?

```
                    Romero - Direct                     32
```

1  A.   This is what they paid me for that week, $500.

2  Q.   And why did they pay you $500 that week?

3  A.   For work for five days.

4  Q.   And to be clear, the documents that you're looking at

5  now, these are the entirety of the written records you've ever

6  been given by 8 Paet Rio?

7  A.   Yes.

8  Q.   Thank you.  You don't have to look at that document

9  anymore.  Now, during your time at 8 -- withdrawn.  When you

10 first started at 8 Paet Rio, were you told that you were going

11 to get a break?

12 A.   Yes.

13 Q.   And what were you told?

14 A.   That I would have half an hour for lunch which I did not

15 take or enjoy.

16 Q.   I think you said -- when you actually started working

17 were you able to take a break?

18 A.   No.

19 Q.   And why were you able to take a break?

20           THE INTERPRETER:  Were or were not?

21 Q.   Why were -- why weren't you able to take a break?

22 A.   In order for me to complete or finish the job tasks I had

23 to do.

24 Q.   Now, you testified earlier that you worked at 8 Paet Rio

25 as a delivery worker.  Do you remember that testimony?

Romero - Direct                                    33

1    A.    Yes.

2    Q.    And when you first started at 8 Paet Rio how many

3    deliveries would you typically do in a day?

4    A.    Ten or 12.

5    Q.    And did that ever change over your time at 8 Paet Rio?

6    A.    No.

7    Q.    And how much of your time on a typical day do you

8    estimate you spent doing deliveries on a typical day?

9    A.    About some four or five hours.

10   Q.    And was the rest of your time at 8 Paet Rio consumed

11   doing any other activities that you described for us or

12   something else?

13   A.    Yes.

14   Q.    And when did you stop working at 8 Paet Rio?

15   A.    After November 20, 2015.

16   Q.    Do you recognize the name Kritikar Savaphapsakul?   I

17   apologize if my pronunciation is off.

18   A.    Yes.

19   Q.    And who's that?

20   A.    She was the partner associate, partner female associate

21   of the female owner.

22   Q.    And again, when you say the female owner, who are you

23   referring to?

24   A.    Phimploy.

25   Q.    And did you work with Kritikar at 8 Paet Rio?

```
                    Romero - Direct                      34
```

1    A.    Yes.

2    Q.    And what did she do at 8 Paet Rio?

3    A.    Well, she was there taking orders as a waitress.

4    Q.    And what else did she do?

5    A.    Just that.

6              THE COURT:  Just push the microphone a little bit

7    closer to you.  Push it down a little bit.

8    Q.    And did she have any responsibility for managing you at 8

9    Paet Rio?

10             MR. LI:  Objection.

11   A.    No.

12             THE COURT:  Hang on.

13             MR. LI:  Counsel is pointing --

14             THE COURT:  Hang on.  The answer is no.  Do you

15   object?

16             MR. LI:  No.  I didn't hear that.  Sorry.

17             THE INTERPRETER:  If the interpreter or somebody

18   would instruct the witness that when somebody objects that he

19   is supposed to --

20             THE COURT:  Yes.  So occasionally the lawyer for the

21   defendants may say objection.  Don't answer the question until

22   you hear from me whether you should respond or should not

23   respond.  We need a moment to be able to decide.    Okay.  But

24   just on the defendant's side, again, if you can pull the

25   microphone closer or move closer to it so we can be sure that

Romero - Cross                                    35

1   I hear you as well as the witness hears you.  All right.  Mr.

2   Clark.

3   Q.    When you were working at 8 Paet Rio were you familiar

4   with an individual named Napaporn Likitsansook?

5   A.    No.

6   Q.    Now, do you know what forms of payments 8 Paet Rio would

7   take for its goods and services?

8   A.    No.

9   Q.    You testified earlier that you did deliveries, right?

10  A.    Yes.

11  Q.    Can you estimate what the dollar value of those

12  deliveries were?

13  A.    Between 20 and $30.

14  Q.    And at your time at 8 Paet Rio did you have the

15  opportunity to observe how many paying customers the

16  restaurant would have a day?

17  A.    No.

18          MR. LI:  Would you speak into the microphone,

19  please, because I could not hear when you ask questions.

20          MR. CLARK:  Oh, okay.  I'll try my best.  Hopefully

21  I don't have all that much more.

22          MR. CLARK:  I don't have any further questions for

23  this witness, Your Honor.

24          THE COURT:  All right.  So now the defendant's

25  attorney is going to ask you some questions.  I don't know if

Romero - Cross                              36

1   you can all see each other, but again, if you want to move to

2   a different part of the table so you can see the witness

3   better, that's fine.  Unfortunately, we have to use the table

4   microphones.

5           THE COURT:  Mr. Clark, do you mind moving to the

6   other side?

7           MR. CLARK:  Oh, I'm sorry.

8           THE COURT:  He'll probably have a better sight line.

9   Thanks.

10          MR. LI:  First, Your Honor, before I cross examine

11  this particular plaintiff, defendant wants to move for

12  dismissal of this case against defendant Kritikar

13  Savaphapsakul because plaintiff failed to establish that he

14  took any managerial roles while working at the restaurant.  So

15  therefore, she should not be individually liable if there is

16  any liability against the restaurant.

17          THE COURT:  Mr. Clark, again, same thing,

18  microphone.

19          MR. CLARK:  My apologies.  I'm not sure if this is

20  the right time for that but I'd stipulate to her dismissal as

21  a defendant in the case.

22          THE COURT:  Well, are you going to offer any other

23  witnesses?

24          MR. CLARK:  This is the only witness.

25          THE COURT:  Right.  So it is the right time.  Okay.

```
                    Romero - Cross                    37
```

1    I'll reserve on that.  Okay.  You made the motion.

2                        CROSS EXAMINATION

3    BY MR. LI:

4    Q.    Now, Mr. Romero, good morning.

5    A.    Good morning.

6    Q.    Can you tell us prior to working for this particular

7    restaurant what did you do?

8    A.    I worked at another restaurant.

9    Q.    Can you name that restaurant?

10   A.    Red Vessel.

11   Q.    Do you remember where it is?

12   A.    In Astoria.

13   Q.    Can you tell us during which time did you work there?

14            MR. CLARK:  Objection.

15            MR. LI:  Let me rephrase.

16   Q.    Do you remember when was the last date that you worked

17   there?

18   A.    Approximately around June 20, 2014.

19   Q.    Do you recall what date you started working for that

20   restaurant?

21            MR. CLARK:  Objection.

22            THE COURT:  He already answered the question.

23   What's the answer?

24            THE WITNESS:  Could you repeat it once again?

25   Q.    Do you remember when did you start working for that

```
                    Romero - Cross                      38
```

1  restaurant?

2  A.   Towards the early part of March of that same year.

3  Q.   Can you tell us why did you quit that place and start

4  working for 8 Paet Rio?

5  A.   I was offered employment there.

6  Q.   Did you get paid more in 8 Paet Rio than the one you

7  worked prior to that?

8           MR. CLARK:  Objection.

9           THE COURT:  Denied.  You can finish the question.

10          THE INTERPRETER:  I didn't finish translating, Your

11 Honor.

12          THE COURT:  Okay.

13 A.   No.

14 Q.   Can you describe to us the circumstances that you were

15 offered a job at 8 Paet Rio?

16 A.   I had worked with them and I ran into them and they

17 offered me the job.

18 Q.   When you state them, who do you refer to?

19 A.   Specifically Kritikar.

20 Q.   Who else?

21 A.   Just her.

22 Q.   Then did you start right away?

23 A.   Yes.

24 Q.   Do you know when 8 Paet Rio first start for business?

25 A.   I do not recall the exact date.

1   Q.   When you start working for 8 Paet Rio were you aware that

2   the restaurant had just started or was there for it while?

3   A.   It had just started.

4   Q.   Can you tell us while you're working for 8 Paet Rio where

5   did you stay?

6            THE COURT:  Do you want to clarify?

7            THE INTERPRETER:  It is difficult to translate --

8            MR. LI:  Let me rephrase it.  I'm sorry.

9            THE INTERPRETER:  -- the word stay into Spanish.

10           MR. LI:  Let me rephrase.

11           THE COURT:  So what is it?  What do you mean when

12  you say stay?

13           THE INTERPRETER:  Thank you, Your Honor.

14  Q.   Where did you reside while you were working at 8 Paet

15  Rio?

16  A.   In Corona, Queens.

17  Q.   Was that all the time?

18  A.   Yes.

19  Q.   So normally how did you go to work?

20  A.   By bicycle.

21  Q.   Normally how long did it take for you to get to work from

22  home?

23  A.   About 15, 20 minutes.

24  Q.   Was it the same after work?  Was it the same amount of

25  time for you to get home from work after the day's work is

```
                    Romero - Cross                      40
```

1   done?

2   A.   Yes.

3   Q.   Were you living alone?

4   A.   Yes.

5   Q.   Do you have family or children in the United States?

6           MR. CLARK:  Objection.

7           THE COURT:  Sustained.  You don't have to answer

8   that question.

9           MR. LI:  Your Honor, the reason I ask that question

10  is plaintiffs contend that he worked extended hours on a daily

11  basis for every single day in the week.  We wanted to ask

12  whether this is true or not.

13          THE COURT:  Why don't you ask specific questions

14  about his activities then?

15          MR. LI:  Okay.

16  Q.   Mr. Romero, you testified earlier about your duties at

17  the restaurant.  Can you tell us again?

18  A.   Delivering food, cutting vegetables, cutting meat,

19  cleaning seafood, washing dishes, cleaning the kitchen.

20  Q.   This actually was the fourth time if I heard it correctly

21  that you testified about your duties at the restaurant.  In

22  the prior three occasions when plaintiff's attorney asked you

23  the same question you didn't mention cleaning the kitchen.

24  Was it true that --

25          MR. CLARK:  Objection.

1          THE COURT:  Sustained.  He did mention it.  There

2    was the testimony about waiting for the cooking to be finished

3    so that he could clean the kitchen.  I just want to be clear

4    because you said the line of questioning.  I'm not saying you

5    can't ask questions about his non-work activities.  So I don't

6    know if you thought I was saying that or not.  The line of

7    questioning that you were trying to pursue earlier which was

8    to suggest that it was not possible for him to do the amount

9    of work he said he did because of other commitments, you can

10   explore that if you want, but not the kind of generic question

11   that you asked about family.  So anyway, just ask him the

12   question.  But there was testimony about cooking.  I'm sorry,

13   about cleaning after cooking.

14          MR. LI:  Your Honor, what I was trying to say is

15   plaintiff's counsel Sean Clark asked the same question three

16   times and each time we get different answers.

17          THE COURT:  Okay.

18          MR. CLARK:  The record will reflect whatever --

19          THE COURT:  No we don't need the narrative.  Just

20   ask the witness the question.  Go ahead.

21   Q.   Was it true that the cleaning the kitchen was not a big

22   part of your duty every day and sometime you forget to

23   mention?

24          MR. CLARK:  Objection.

25          THE COURT:  Finish translating the question.

                    Romero - Cross                      42

1              THE INTERPRETER:  I told him that there was an

2   objection.

3              THE COURT:  The question is is cleaning part of your

4   job?

5              THE WITNESS:  Yes.  It later on became part of my

6   job.  I had to do it every day.

7              THE COURT:  Next question.

8   Q.   When you say later on, what do you mean?

9   A.   Because I started there as a delivery, a food delivery

10  person.

11  Q.   Can you tell us since what time cleaning the kitchen

12  started, became one of your job responsibilities?

13  A.   From the beginning, just once I had started to work.

14  Q.   You testified earlier that you worked from 11 a.m. to as

15  late as 1 a.m. the next day two to three times a week.  Is

16  that correct?

17  A.   From the beginning.

18  Q.   Can you answer the question directly?

19  A.   I do not remember the dates.

20  Q.   I was asking was it correct that you worked from 11 a.m.

21  until early morning of the next day two to three times a week?

22  Was it correct?

23  A.   Yes.

24  Q.   On those occasions do you recall when the restaurant was

25  actually closed?

                    Romero - Cross                    43

1   A.    No.

2   Q.    So you -- let me take that back.  On those occasions when

3   you departed from work was the restaurant closed already?

4   A.    No.

5   Q.    When you departed from work on those occasions did you

6   notice any customer in the restaurant?

7   A.    Yes.

8   Q.    How many customers do you -- I take that back.  Do you

9   know if those customers you referred to are the families of

10  the owner or the real customers?

11  A.    Clients.

12  Q.    Are you familiar with that neighborhood?

13  A.    No.

14  Q.    Are you familiar with the neighborhood that you lived in?

15  Are you familiar with the neighborhood you lived in?

16          THE INTERPRETER:  Lived or live in?

17          MR. LI:  Lived in at that time.

18          THE INTERPRETER:  Lived.  Thank you.

19  A.    Yes.

20  Q.    Do you know it's not a safe neighborhood in the location

21  where the restaurant is located?

22  A.    No.

23  Q.    On those occasions when you say you worked until early

24  morning, while you departed from work the kitchen was still

25  operating?

```
                    Romero - Cross                     44
```

1   A.   Yes.

2   Q.   Then you testified about a year later your shift became

3   from 11 a.m. to 11:15 or 11:30 p.m., is that correct?

4           THE INTERPRETER:  Did you say 11:30?  11:15 to --

5           MR. LI:  11:15 or 11:30.

6   A.   Yes.

7   Q.   On those occasions while you worked until 11:15 or 11:30,

8   while you departed from work did you notice if the restaurant

9   is closed?

10  A.   Not anymore.

11  Q.   Not anymore meaning that the restaurant was not open or

12  the restaurant was still open?

13          MR. CLARK:  Objection.

14          THE COURT:  I'm sorry, what's the answer?

15          THE WITNESS:  At that hour they were closed already.

16          THE COURT:  Okay.

17  Q.   While you were working in the restaurant, 8 Paet Rio, did

18  you get any breaks during your shift?

19  A.   No.

20  Q.   Did you eat during your shift?

21  A.   Yes.

22  Q.   How long usually did it take you to eat?

23  A.   Ten or 15 minutes.

24  Q.   Were you busy in your shift?

25  A.   Yes.

Romero - Cross                                        45

1  Q.   Can you describe to me whether the restaurant was busy?

2  A.   Not the restaurant but we had to do things.

3          MR. LI:  I want to present Defendant Exhibit C but I

4  can use Plaintiff Exhibit 1 because they're the same.  Shawn

5  Clark has a copy of it, it's Defendant Exhibit C.

6          THE COURT:  All right.  I'm sorry I keep repeating

7  this but you're going to have to use the microphone.  All

8  right.  What you want to do is -- we're looking at --

9          MR. LI:  Yeah, I want to use Defendant Exhibit C but

10 --

11         THE COURT:  Which is also Plaintiff's 1.

12         MR. LI:  -- since Mr. Clark has already presented

13 Plaintiff Exhibit 1 which is identical to Defendant Exhibit C,

14 so --

15         THE COURT:  All right.  We'll work from that copy.

16         MR. LI:  -- that's a little larger, the font, so

17 want to get the court's approval to use Plaintiff Exhibit 1

18 instead.

19         THE COURT:  That's fine.  All right.  So we're going

20 to look at the copy of the document that you have.  You still

21 have it, right?

22 Q.   Can you tell us where did you get all these documents

23 from?

24 A.   From the check stubs of the payments of the checks to my

25 payments.

1   Q.   Were the originals originally attached to the check?

2   A.   Yes.

3   Q.   When you received the original documents that you're

4   looking at, were they still attached to checks?

5   A.   Yes.

6   Q.   Who tear them off?

7   A.   Me.

8   Q.   Do you remember normally where would you locate it

9   physically when you tear the pay stub, the document you're

10  looking at, off the checks?

11  A.   Yes.

12  Q.   No, the question is do you remember where you were when

13  you tear --

14          THE COURT:  Do you remember?  So your follow-up

15  question then.

16  Q.   All right.  So where was that?

17  A.   In the restaurant.

18  Q.   Afterwards, what did you do with the checks?

19  A.   I would deposit them into my account.

20  Q.   Every week you work in the restaurant did you always get

21  paid?

22  A.   Yes.

23  Q.   Can you describe to us the form of the payment?

24  A.   Part by check and part in cash.

25  Q.   Is it always the case part in cash, part in check?

1  A.   On some occasions it was all in cash.

2  Q.   Can you tell us how many times you recall that you were

3  paid in cash only?

4  A.   I do not recall exactly.

5  Q.   Was it less than five times?

6  A.   It could have been five or six times.

7  Q.   Are you telling us it was definitely fewer than ten

8  times?

9  A.   Yes.

10          MR. LI:  Your Honor, I do not have any further

11  questions.

12          MR. CLARK:  No redirect, Your Honor.

13          THE COURT:  All right.  So your testimony is

14  finished.  You can have a seat back at counsel table.  I'm

15  going to take a five-minute break and then we'll start with

16  defendant's witnesses.  All right?

17  (Off the record at 11:47 a.m.)

18  (Back on the record at 12:03 p.m.)

19          THE COURT:  Okay.  So we're back on the record

20  continuing the trial in the Romero case, 16-1239.

21          So we have the declaration.  So we're just going to

22  have the witnesses testify by the declarations, is that right

23  on defendant's side?

24          MR. LI:  Yes.

25          THE COURT:  Okay.  So it's just cross examination?

48

 1          MR. CLARK:  Yes.

 2          THE COURT:  What order do you want to do it in?

 3          MR. CLARK:  Well, my experience is usually that the

 4 witnesses on the -- I don't know if we wanted to submit the --

 5 you said the declarations were admitted?

 6          THE COURT:  I thought we did it earlier on

 7 agreement.

 8          MR. CLARK:  Usually we put them on for direct for

 9 like two minutes where it's like did you sign this, blah,

10 blah, blah, and then they're turned over for cross.  So in

11 that, it's usually them to decide but whichever.

12          THE COURT:  Okay.  So I don't think we need to do

13 that because you all agree these could be admitted for what

14 they're worth already.

15          MR. CLARK:  Sure.  And I was even talking with

16 defendant's counsel that we might be able -- I reviewed this

17 declaration and --

18          THE COURT:  Which one?

19          MR. CLARK:  Actually, they're all very brief

20 declarations.

21          THE COURT:  They are?

22          MR. CLARK:  I don't think that there's an enormous

23 amount of cross to be done.  We could potentially get Napaporn

24 done hopefully before 12:30.

25          THE COURT:  Okay.  We can go past 12:30.  That was

P. Likitsansook - Cross                          49

1   just to give you a break to do it.  All right.  Do you have

2   any agreement as to what order you want to call these

3   witnesses?

4          MR. LI:  Phimploy, Kritikar, and Napaporn.  Does

5   that work?

6          THE COURT:  All right.  So which witness first?

7          MR. LI:  Phimploy.

8          THE COURT:  All right.  Come on up here.  You can

9   stand and have the translator, interpreter, stand next to you

10  and use the microphone.

11          THE CLERK:  Raise your right hand.

12      (PHIMPLOY LIKITSANSOOK, DEFENDANT'S WITNESS, SWORN)

13          THE CLERK:  Could you state your name for the

14  record?

15          THE WITNESS:  Phimploy Likitsansook.

16          THE CLERK:  Thank you.

17          THE COURT:  Can you also spell your name for the

18  record, please?

19          THE WITNESS:  P-H-I-M-P-L-O-Y.

20          THE COURT:  All right.  Thanks.  So for the

21  interpreter, when you're doing it, if you can speak up and

22  also use the microphone.  That's helpful.

23          THE INTERPRETER:  Yes, Your Honor.

24          THE COURT:  Thanks.

25          THE INTERPRETER:  The spelling is P-H-I-M-P-L-O-Y.

```
                 P. Likitsansook - Cross                    50
```

1   The last name is L-I-K-I-T-S-A-N-S-O-O-K.

2           THE COURT:  All right.  Thank you.  All right.  Mr.

3   Clark, you're going to cross examine the witness.

4           MR. CLARK:  Thank you, Your Honor.

5                        CROSS EXAMINATION

6   BY MR. CLARK:

7   Q.   Good afternoon, Ms. Likitsansook.

8   A.   Good afternoon.

9   Q.   You testified that the hours of operation at 8 Paet Rio

10  are from 11 a.m. to 11 p.m., correct?

11  A.   Yes.

12  Q.   And that's seven days a week, right?

13  A.   Sometimes.

14  Q.   And isn't it true that you would be at the restaurant

15  after 11 p.m. quite frequently?

16  A.   I work seven days a week from in the morning 11 o'clock.

17  Q.   Respectfully, I don't think that that was responsive to

18  my question.  Specifically, I was asking isn't it true that

19  you're frequently at the restaurant after 11 p.m.?

20  A.   No.

21  Q.   Well, are you never at the restaurant after 11 p.m.?

22  A.   Yes, I'm there.

23  Q.   So you are sometimes at the restaurant after 11 p.m.?

24  A.   Every day I'm there.

25          THE COURT:  All right.  Let's try it differently.

P. Likitsansook - Cross                    51

1  What hours are you usually at the restaurant?

2          THE WITNESS:  11 o'clock until closing time.

3          THE COURT:  And what time is closing time?

4          THE WITNESS:  11 p.m.

5          THE COURT:  Do you ever stay later than 11 p.m.?

6          THE WITNESS:  Sometimes, yes.

7          THE COURT:  How often?

8          THE WITNESS:  Not much.

9          THE COURT:  All right.  That's --

10 Q.   And sometimes you're at the restaurant at 11:30 p.m.,

11 right?

12 A.   Yes.

13 Q.   And in fact sometimes you're at the restaurant at

14 midnight?

15 A.   Yes.

16 Q.   And sometimes you're at the restaurant at 12:30 at night?

17 A.   Yes.

18 Q.   And sometimes you're at the restaurant at 1 a.m. in the

19 morning, right?

20          MR. LI:  Objection.  I mean if plaintiff's counsel

21 has anything to ask, just please direct because this kind of

22 questioning, I mean are you going to go 2, 3?

23          THE COURT:  All right.  Hang on.

24          MR. CLARK:  Your Honor, it's cross.

25          THE COURT:  You need to use the microphone.  The

P. Likitsansook - Cross                        52

1    objection is denied.

2             MR. LI:  Okay.  Objection.

3             THE COURT:  You can answer.

4             MR. LI:  If plaintiff has a specific question to

5    ask, please be direct because this line of questioning doesn't

6    get us anywhere.

7             THE COURT:  All right.  Denied.  Just go ahead with

8    your questions.

9    Q.   My question, I believe the last question that I asked is

10   isn't it true that you're sometimes at the restaurant at 1

11   a.m. in the morning?

12   A.   Not true.

13   Q.   But isn't it true that you're sometimes at the restaurant

14   after 12:30 at night?

15   A.   Sometimes.

16   Q.   And you're not alone at the restaurant when you're there

17   after 11 p.m., are you?

18   A.   I was there eating.

19   Q.   The respectfully, I don't think that that's responsive to

20   my question.  You were --

21            THE COURT:  Okay, let me interrupt for a minute.

22   Even though this is cross examination, why don't you try it

23   more like a direct because I think it would be easier in the

24   translation.  And then if you need to ask questions more of a

25   cross examination style, you can do that as well.

```
                    P. Likitsansook - Cross                    53
```

1   Q.   When you're at the restaurant after 11 p.m., aren't there

2   other individuals there?

3   A.   No.

4   Q.   So you're saying that you're all alone at the restaurant

5   sometimes as late as 12:30 at night?

6   A.   No, it's between 11 and 12.

7   Q.   But you just testified that you're sometimes at the

8   restaurant as late as 12:30, right?  It's your testimony now

9   that you never worked at the restaurant as late as 12:30 at

10  night?

11  A.   No.

12          MR. CLARK:  I'm sorry, I don't think I heard the

13  translator.

14          THE INTERPRETER:  No.

15          THE COURT:  Yes, you need to use the microphone for

16  the translator and speak up.

17  Q.   Now, you testified that the last call from the kitchen is

18  15 minutes before closing hours, isn't that correct?

19  A.   Yes, correct.

20  Q.   So when does the kitchen close typically?

21  A.   The kitchen normally closes about 10:45.  Not later than

22  11.

23  Q.   So sometimes the kitchen closes at 11, right?

24  A.   We close on time.

25  Q.   Just if I understand your testimony correctly, you just

P. Likitsansook - Cross                    54

1  testified that the kitchen closes at 10:45, no later than 11,

2  isn't that right?

3  A.    That's correct.

4  Q.    So that would mean necessarily that the kitchen sometimes

5  closes at 11, right?

6  A.    No.

7  Q.    Okay.  So since the kitchen closes at 10:45, we'll use

8  that time, if a customer came in at 10:44 he could still order

9  food, right?

10  A.    No.

11  Q.    Well, if a customer is already dining in the restaurant

12  and he wanted to order food at say 10:40, he'd still be able

13  to order food, right?

14  A.    No.

15  Q.    So even though the kitchen doesn't close until 10:45,

16  you're saying that a customer wouldn't be able to order food

17  before that time?

18  A.    We close at 10:45.  We notify the customers last call.

19  Q.    Indeed you say it's last call at 10:45, right?  That's my

20  understanding of your testimony.

21  A.    Yes.

22  Q.    And if it's last call, that means that the customer can

23  still order food, right?

24  A.    No.

25  Q.    So what do you think last call is?

1  A.   We will tell the customer the kitchen will be closed at

2  10:40.

3  Q.   Okay.  So before 10:40 they can still order food, right?

4  A.   Mostly we don't have anybody to work.

5  Q.   Okay.  That I don't think is responsive to the question.

6  And customers can order food before 10:40 at night, right?

7  A.   No.

8           THE COURT:  Let's ask in order.  What's the last

9  time somebody could order food at the restaurant?

10          THE WITNESS:  10:40.

11  Q.   So a customer could order food at 10:35 p.m., right?

12  A.   Yes.

13  Q.   And if he orders the food at 10:35 p.m., you still need

14  to make the food at 10:35 p.m., right?

15  A.   One more time, please?

16  Q.   If a customer orders food at 10:35 p.m., you'll still

17  need to make his order at 10:35 p.m., right?

18  A.   Correct.

19  Q.   And you'll allow him to eat that food at the restaurant,

20  right?

21  A.   Yes.

22  Q.   And how long does it take to cook a dish for a customer

23  at 8 Paet Rio?

24  A.   About two minutes.

25  Q.   So cooking an entire order for a customer at 8 Paet Rio

P. Likitsansook - Cross                          56

1    takes two minutes?

2    A.    Yes.

3    Q.    And how long does it take to serve a customer at 8 Paet

4    Rio?

5    A.    Totally it would not take longer than three minutes.

6    Q.    So if a customer orders at 10:35 p.m., it's your

7    testimony that he's going to have his food by 10:40 p.m.?  Is

8    that your testimony?

9    A.    Not that long.

10   Q.    It's not even going to take five minutes for him to get

11   his order?

12   A.    About three minutes.

13   Q.    Okay.  So if a customer orders a dish at 10:35 p.m., it's

14   your testimony here today that he would get that dish by 10:38

15   p.m.?

16   A.    Correct.

17   Q.    Okay.  And how long do you estimate that a customer would

18   take to eat an order of food from 8 Paet Rio?

19   A.    About 15 minutes or ten minutes.  It depends.

20   Q.    So your testimony is it would take between ten and 15

21   minutes to eat an entire order at 8 Paet Rio?

22   A.    Yes.

23   Q.    And do customers sometimes have to stay after 11 p.m. in

24   order to finish the dishes that they order earlier in the

25   evening?

P. Likitsansook - Cross                    57

1   A.    No, I'll go tell the customers.

2   Q.    So the customers never stay past 11 p.m. at 8 Paet Rio?

3   A.    That's right.

4   Q.    Now, you testified that the plaintiff in this action

5   would usually arrive around 11 a.m., right?

6   A.    No.

7   Q.    You didn't testify that --

8           THE COURT:  Let's just be clear.  When he says you

9   testified, he's talking about what you said in this document.

10  This document is considered testimony even though it's

11  written.  And Mr. Clark is asking you questions about the

12  testimony and maybe other things.  All right.  So now why

13  don't you ask the question again?

14  Q.    You have said that the plaintiff here would usually

15  arrive around 11 a.m., right?

16  A.    Yes.

17  Q.    And you've also said that the plaintiff would usually

18  depart at or before 11 p.m.?

19  A.    Yes.

20  Q.    And you never specifically recorded when he would come in

21  in the morning, did you?

22  A.    Sometimes, but only -- the door would open at 11 o'clock.

23  Q.    But specifically, you never recorded in writing or some

24  other way exactly when plaintiff would come in in the morning,

25  right?

P. Likitsansook - Cross                      58

1    A.   I feel I have.  Not much.

2    Q.   So you're saying that you would write down the exact time

3    that the plaintiff would come in in the morning?

4              MR. LI:  Objection.  I believe this particular issue

5    is already stipulated between parties and I don't know where

6    plaintiff's counsel wants to lead us to.

7              THE COURT:  All right.  The --

8              MR. CLARK:  I think it speaks to the credibility of

9    the witness.

10             THE COURT:  Denied, denied, denied.  Answer the

11   question.  You can answer the question.  Did you write down

12   when the plaintiff came to work?

13             THE WITNESS:  He signed.

14   Q.   So it's your testimony here today --

15             THE COURT:  Hold on, hold on.  The question is did

16   you write down when the plaintiff came to work?

17             THE WITNESS:  I did not.

18             THE COURT:  Okay.  Next question.

19   Q.   Okay.  And did you yourself write down the exact time

20   that the plaintiff would leave work?

21   A.   He wrote it down.

22   Q.   So it's your testimony that you would have the plaintiff

23   write down exactly when he would leave work?

24   A.   Correct.

25   Q.   And you don't have any of those writings anymore, do you?

P. Likitsansook - Cross                    59

1   A.    Yes.

2   Q.    You're saying you do have those documents?

3   A.    I don't remember.

4   Q.    Okay.  Now, you testified that employees were given meal

5   breaks at 8 Paet Rio, right?

6   A.    Yes.

7   Q.    And did you have employees record exactly when they

8   started to take their meal break?

9   A.    No.

10  Q.    And did you record exactly when employees would stop

11  taking their meal breaks?

12  A.    No.

13  Q.    So you don't know exactly how much time your employees

14  spent taking meal breaks, do you?

15  A.    No, I don't.

16          MR. CLARK:  I don't think I have any further

17  questions for this witness, Your Honor.

18          THE COURT:  All right.  Any redirect?

19          MR. LI:  Yes.

20          MR. CLARK:  Should I switch around?

21          THE COURT:  Whatever works for you all, but yes.

22                    REDIRECT EXAMINATION

23  BY MR. LI:

24  Q.    Ms. Likitsansook, how do you describe the business in

25  general in the restaurant?

P. Likitsansook - Redirect                    60

1   A.    Low.

2   Q.    Can you be more specific?

3   A.    [Indiscernible].

4         THE COURT:  Do it in Thai.

5   A.    Very quiet.  No customers.

6   Q.    Being a very quiet environment, can you tell us what is

7   the busiest time usually during the day?  During the day I

8   mean from the start of the restaurant to the closing of the

9   restaurant.

10        THE COURT:  I just want to clarify one thing.  This

11  is all about the time period when the plaintiff was working at

12  the restaurant.  All right.  Okay.  So if you could ask the

13  question and translate the question.

14  Q.    While the plaintiff worked at the restaurant, can you

15  tell us on any given day on a typical day when was usually the

16  busiest time?

17  A.    Something happened on Saturday and Sunday.

18  Q.    So let me focus on Saturdays and Sundays first.  So on

19  Saturdays when usually was the busiest time?

20  A.    In the evening.

21  Q.    Can you tell us in the evening of any Saturday when did

22  you usually start getting busy?

23  A.    In the daytime on Saturday it's busy.  At nighttime it's

24  quiet.

25  Q.    How about Sundays?

P. Likitsansook - Redirect                    61

1  A.    Not that busy.

2  Q.    Earlier you testified that Saturdays and Sundays are the

3  busiest time.  Was that still correct?

4  A.    Correct.

5  Q.    So are you telling us Monday, Tuesday, Wednesday,

6  Thursday, and Fridays the restaurant was even less busy?

7  A.    Less busy.  That's correct.

8  Q.    So let's again focus on Saturdays.

9  A.    On Saturday it's busy.

10  Q.    Okay.  After 9 or 9:30 p.m., do you usually still serve

11  customers?

12  A.    Yes.

13  Q.    Can you tell us normally on those occasions how many

14  customers were still in the restaurant?

15  A.    From 4 to 5, customers.

16  Q.    How about after 10 or 10:30?  How many customers were

17  still in the restaurant?

18  A.    None.

19  Q.    Do you know why?

20  A.    That area is quiet.

21  Q.    Do you mean there are not a lot of pedestrian traffic

22  outside the restaurant?

23  A.    That's correct.

24  Q.    How about all the traffic, vehicle traffic on the street

25  outside the restaurant?

```
                 P. Likitsansook - Redirect                    62
 1          MR. CLARK:  Objection.
 2          THE COURT:  Denied.  Answer the question.
 3  A.    Not much.
 4  Q.    Do you know why there are no traffic outside the
 5  restaurant?
 6  A.    It's a quiet area.
 7  Q.    Did you yourself initially select this place to open this
 8  restaurant?
 9  A.    I did.
10  Q.    Before you signed the lease, presumably you did, did you
11  know that this was a quiet street?
12  A.    I have no idea at all.
13  Q.    So normally what did you do if you don't have customers
14  in the restaurant at 10 or 10:30?
15  A.    I kept cleaning the kitchen.
16  Q.    When you say you kept cleaning the kitchen, do you mean
17  that you clean yourself or have someone else clean it?
18  A.    I did it myself.
19  Q.    While you were cleaning the kitchen in the evening, were
20  you aware any of your other employees still in the restaurant?
21  A.    Nobody.
22  Q.    Can you tell us when did you usually clean the kitchen?
23  A.    10 o'clock.
24  Q.    Are you telling us at 10 o'clock all your employees went
25  home already, is that true?
```

63

1   A.    No, they're still there.

2   Q.    Specifically, do you recall that the plaintiff was still

3   there in the restaurant while you were cleaning the kitchen?

4   A.    No.  I cleaned it myself.

5   Q.    Can I ask you why didn't you ask your employees for help?

6   A.    Time is not for him to work there.

7   Q.    You just testified that that was 10 o'clock.  When did he

8   usually leave?

9   A.    11 o'clock.

10  Q.    Between 10 and 11 do you know what he usually did?

11  A.    Between -- after he finished the kitchen, he did nothing.

12  Q.    Did he eat?

13  A.    Yes.

14  Q.    When did you usually provide food in the evening?

15  A.    10 o'clock.

16            MR. LI:  I do not have further questions.

17            THE COURT:  All right.  Recross?

18            MR. CLARK:  No recross, Your Honor.

19            THE COURT:  All right.  So this witness, you can

20  step down.  Thank you.  Okay.  All right.  Is the next witness

21  going to be Kritikar Savaphapsakul?

22            MR. LI:  Yes.

23            THE COURT:  Okay.  Why don't you come on up?  She

24  also needs the translator?

25            MR. LI:  Yes, I think so.

Ms. Savaphapsakul - Cross                    64

1          THE COURT:  Okay.

2          MR. LI:  The last one to need it.

3          THE COURT:  Okay.  Stay standing.

4          THE CLERK:  Raise your right hand.

5      (KRITIKAR SAVAPHAPSAKUL, DEFENDANT'S WITNESS, SWORN.)

6          THE CLERK:  State your full name for the record.

7          THE WITNESS:  Kritikar Savaphapsakul.

8          THE COURT:  And can you spell it for the record?

9  You can put your hand down.

10         THE WITNESS:  K-R-I-T-I-K-A-R, S-A-V-A-P-H-A-P-S-A-

11 K-U-L.

12         THE COURT:  That's okay.  That was in English,

13 right?

14         THE INTERPRETER:  Yes.

15         THE COURT:  Okay.  All right.  So it's fine.  You

16 want to use the translator though, correct?

17         THE WITNESS:  Yes.

18         THE COURT:  All right.  So you can have a seat.  All

19 right.  So to be clear, what we have is this document that I'm

20 holding here.  So this is your testimony for this case.  All

21 right?  So now what's going to happen is the plaintiff's

22 attorney is going to ask you questions.

23         THE WITNESS:  Okay.

24         MR. CLARK:  I'll be brief.

25         THE COURT:  That's all right.

Ms. Savaphapsakul - Cross                    65

1                            CROSS EXAMINATION

2   BY MR. CLARK:

3   Q.    Good afternoon, Ms. Savaphapsakul.

4   A.    Good afternoon.

5   Q.    You testified you left the restaurant in February 2015,

6   isn't that right?

7   A.    Yes.

8   Q.    And you didn't have any real interaction with the

9   restaurant after that date, right?

10  A.    That's correct.

11  Q.    And you also testified I believe that the plaintiff

12  started working in September 2014?

13  A.    Yes.

14  Q.    When did you start working?

15  A.    Same time.

16  Q.    And did you start exactly the same day that the plaintiff

17  started?

18  A.    No.

19  Q.    Did he start after you or before you?

20  A.    Two days before me he worked.

21  Q.    So he started before you?

22  A.    No, I'm sorry, I started before him two days.

23  Q.    Okay.  So you're saying that you worked for two days and

24  then the plaintiff started.  Okay.

25              THE COURT:  Is that correct?

```
                    Ms. Savaphapsakul - Cross              66
 1  Q.    Is that correct?
 2  A.    That's correct.
 3  Q.    And now, you also testified that he worked five or six
 4  days a week, is that right?
 5  A.    Yes.
 6  Q.    And you never recorded exactly when the plaintiff would
 7  come in in the morning, did you?
 8  A.    I never did.
 9  Q.    And you never recorded exactly when he left at night,
10  correct?
11  A.    That's correct.
12  Q.    And you never tracked exactly when he would take a meal
13  break, right?
14  A.    That's correct.
15  Q.    So you don't know exactly how long of a meal break he
16  would typically take, do you?
17  A.    About 30 minutes.
18  Q.    But you didn't actually track that for the plaintiff, did
19  you?
20  A.    I did not.
21          MR. CLARK:  I don't have any further questions for
22  this witness.
23          THE COURT:  Okay.  Redirect?
24          MR. LI:  Yes, yes.
25                      REDIRECT EXAMINATION
```

Savaphapsakul - Redirect                    67

1  BY MR. LI:

2  Q.   Are you aware of the general practices in terms of breaks

3  in the restaurant?

4  A.   We have them between 3 and 4 p.m.

5  Q.   Are you telling me that generally everybody takes a break

6  between 3 and 4 p.m.?

7  A.   Yes.

8  Q.   Did you personally take that break yourself?

9  A.   I did.

10 Q.   When you were taking a break, did you notice what other

11 people were doing in the restaurant?

12 A.   They're all taking a break.

13 Q.   Are you aware of the general practices in the restaurant

14 concerning the meal breaks?

15 A.   We get the food.  The cook brought it from the kitchen

16 and we came out and eat.

17 Q.   While you worked at the restaurant did you always take

18 the meal breaks?

19 A.   Yes.

20 Q.   Do you recall usually how many meal breaks did you take

21 every single day?

22 A.   Two times.

23 Q.   Do you recall usually how long did it take you to eat

24 those food in the meal breaks?

25 A.   About 30 minutes.

68

1  Q.   During those meals breaks do you recall do you often get

2  interrupted while you're eating?

3  A.   Yes, sometimes.

4  Q.   Do you know why there was such interruptions?

5  A.   First, telephones.

6  Q.   Who's listening to the telephones other than you?

7  A.   It's employee.

8  Q.   I understand that.  Who's listening to the telephones

9  other than you?

10  A.   The co-worker who work as a server.

11  Q.   Was the plaintiff one of those workers listening to the

12  telephones?

13  A.   No.

14  Q.   Have you ever been interrupted in your meal breaks other

15  than telephones?

16  A.   No.

17  Q.   While you were taking meal breaks did you notice if --

18  let me take that back.  While you were taking meal breaks did

19  you notice what other people in the restaurant were doing?

20  A.   They were eating.

21  Q.   Did you notice they were interrupted often by something

22  else?

23  A.   No.

24          MR. LI:  I do not have further questions.

25          THE COURT:  All right.  Cross?

```
                    N. Likitsansook - Cross                    69
```

1        MR. CLARK:  No further cross, Your Honor.

2        THE COURT:  Okay.  You can step down.  Thanks.

3   Okay.  So do you want to do the other witness?

4        MR. LI:  Yeah, let's do the other witness.

5        THE COURT:  Can you ask her to come in?  Thanks.

6                   [Pause in proceedings.]

7        THE COURT:  You can leave your bag there and then

8   come on up.

9        MR. LI:  She [inaudible].

10       THE COURT:  Oh, okay.  Thank you.  All right.  So

11  why don't you come on up here and stand in the box.

12       THE CLERK:  Raise your right hand.

13     (NAPAPORN LIKITSANSOOK, DEFENDANT'S WITNESS, SWORN.)

14       THE CLERK:  Please state your name for the record.

15       THE WITNESS:  Napaporn Likitsansook.

16       THE CLERK:  Have a seat.

17       THE COURT:  I'm going to ask you to use the

18  microphone.  You can adjust it so that it's comfortable and

19  speak up.  All right.  And we've got interpreters for the

20  other witnesses.  Do you need an interpreter?

21       THE WITNESS:  I'm fine.

22       THE COURT:  You're comfortable speaking English.

23  Okay.  All right.  So just so you know, I know you were in the

24  other room, the way this is going is that your direct

25  testimony is what's stated in the declaration.  All right.

1  Now the other attorney is going to ask you questions about

2  that.

3           THE WITNESS:  Okay.

4           THE COURT:  All right.  So you've got to keep your

5  voice up.  Move the microphone closer so it's easier.  Okay?

6           THE WITNESS:  Is this better?

7           THE COURT:  Much better.  Thank you.  All right.

8  Mr. Clark?

9           MR. CLARK:  Thank you.

10                    CROSS EXAMINATION

11 BY MR. CLARK:

12 Q.    Good afternoon, Ms. Likitsansook.

13 A.    Hello.

14 Q.    You started working formally at the restaurant after May

15 2015, is that right?

16 A.    May 2015 around early June after my graduation.

17 Q.    Okay.  And then before that you occasionally visited the

18 restaurant on your holidays?

19 A.    Yes, when the dorms closed.

20 Q.    And it was your testimony that you would sometimes go to

21 the restaurant at 11:30 at night to spend the night with your

22 mother, isn't that right?

23 A.    Yes, that's true.

24 Q.    And your mother was at the restaurant at 11:30 at night?

25 A.    Yes, that's true.

N. Likitsansook - Cross                  71

1   Q.   And was that your experience in these periods that it

2   would be around 11:30?

3   A.   Yes.

4   Q.   And do you know of your mom to spend the night at the

5   restaurant past 11 o'clock?

6   A.   Yes.

7   Q.   And what was your mom doing when you were there at 11:30

8   at night?

9   A.   If she is not cooking herself, she is usually cleaning up

10  the kitchen.  Sometimes I would go in to help her just to

11  speed things along.  But it's always her alone in the kitchen

12  in the back.

13  Q.   Okay.  Did you ever go in the basement when you would

14  visit prior to working formally?

15  A.   No.

16  Q.   Okay.  So you don't know what was going on in the

17  basement of the restaurant when you'd come in --

18  A.   No.

19  Q.   -- for these 11:30 periods?

20  A.   Right.

21  Q.   Okay.  And then after you started working at the

22  restaurant you would be working -- withdrawn.  When you

23  started working in the restaurant in May of 2015, you

24  testified that you generally started 10:30 in the morning,

25  right?

N. Likitsansook - Redirect                    72

1  A.   Yes, to do prepping before the day started.

2  Q.   And you testified that you observed when the plaintiff in

3  this case worked at the restaurant, is that right?

4  A.   If I were working and he would pass by or I would see

5  him, that was usually it.

6  Q.   Okay.  But you weren't -- it wasn't your responsibility

7  to track when the plaintiff would work in the morning, right?

8  A.   No.

9  Q.   And it wasn't your responsibility to track when he would

10  leave at the end of the day, right?

11  A.   No.

12  Q.   So you're basing your understanding just on when you

13  would happen to see him in the mornings?

14  A.   Yes.

15  Q.   And you're basing this on when you would happen to see

16  him at night?

17  A.   Yes.

18       MR. CLARK:  I have no further questions for this

19  witness.

20       MR. LI:  I have a short redirect.

21       THE COURT:  Yes.  All right.  Now the other lawyer

22  is going to ask you some questions.

23                    REDIRECT EXAMINATION

24  BY MR. LI:

25  Q.   While you were still in college, on those occasions that

N. Likitsansook - Redirect                    73

1  you visit your mother at 11:30, do you remember when did you

2  usually go home with your mom?

3  A.   On average it's usually after 11:30 and the reason why is

4  because like I said before, she would usually be in the back

5  by herself either cooking or cleaning.  So it would take time

6  for her to finish closing up the restaurant.

7  Q.   When you say closing up the restaurant, do you mean that

8  actually you or your mom locked the restaurant up?

9  A.   It was her who would lock up because she has the keys.

10  Q.   Did you actually see her locking the restaurant up?

11  A.   Yes.

12  Q.   Are you aware there's any separate entrance to the

13  restaurant other than the door she usually locked up?

14  A.   No.

15  Q.   When she locked the restaurant up, were you aware there's

16  somebody else remaining in the restaurant?

17  A.   No.

18  Q.   After you start working for the restaurant, what was your

19  hours?

20  A.   It's usually 11 to 11.  However, like I said, with prep I

21  would come in a little bit earlier.

22  Q.   In the evening do you usually leave at 11, before 11, or

23  after 11 p.m.?

24  A.   I would leave after 11 because even though my hours were

25  until 11 I would wait for my mother.

74

1   Q.   On those occasions you start working for the restaurant,

2   when did you and your mom usually depart from work?

3   A.   I can't give you a specific time for every time but it's

4   almost more than always after 11:30.

5   Q.   Have you ever seen plaintiff in the restaurant before?

6   A.   Yes.

7   Q.   While you were working for the restaurant, did you notice

8   when he departed from work?

9   A.   I don't keep track so I don't know what times he leaves

10  specifically but it is before 11:30.

11             MR. LI:  I do not have further questions.

12             MR. CLARK:  No further cross, Your Honor.

13             THE COURT:  Okay.  All right.  You can step down and

14  sit over there with your mom if you want or in the back.

15  Whatever you like.

16             THE WITNESS:  [Inaudible]?

17             THE COURT:  No, no.  You can if you want to wait for

18  her there.  Okay.  Thank you.  Okay.  So any other motions?

19             MR. CLARK:  Not for the plaintiff.

20             MR. LI:  Not from defendants.

21             THE COURT:  Okay.  All right.  So I'm going to grant

22  the motion to dismiss this case against Kritikar Savaphapsakul

23  because there's no evidence that she had a role as the

24  employer under either the FLSA test or the New York Labor Law

25  test.  So she's out.

1          As to the restaurant and Ms. Likitsansook, you want

2    to make post trial submissions, is that right?

3          MR. CLARK:  Yes, Your Honor.

4          THE COURT:  Okay.  So what schedule do you want to

5    do that on?

6          MR. CLARK:  A month, Your Honor?  Simultaneous.

7          THE COURT:  Yes, I would like it simultaneous.  All

8    right.  Today is the 21st.  You want till the Wednesday before

9    Thanksgiving?  Does that work?  Or you want the Monday?

10         MR. CLARK:  The Wednesday before Thanksgiving works

11   for us.

12         THE COURT:  The 23rd?  Does that work?

13         MR. LI:  It works for me.

14         THE COURT:  Okay.

15         MR. CLARK:  And that's the 25th?

16         THE COURT:  It's the 23rd.  So are you going to order

17   the transcript and share it?  You're going to coordinate?

18         MR. LI:  I'm happy to split the transcript.

19         THE COURT:  Whatever you want to do.  All right.  So

20   we'll enter the minute entry either today or Monday that will

21   have the time stamp and you just contact the ESR department

22   and they'll get the transcript for you.

23         Okay.  Anything else you want to put on the record?

24         MR. CLARK:  Not for the plaintiff.

25         THE COURT:  Okay.  All right.  So --

1          MR. LI:  Not from defendant.

2          THE COURT:  -- just so the record is clear, and we

3    have these three declarations and what was admitted which was

4    the defendant's first -- is that all your exhibits?  Yes.

5    First three which are the same as the plaintiff's Exhibit 1.

6    I'm also going to keep that copy.  All right.  I think we're

7    done.  So you understand you're not --

8          MR. CLARK:  Yes, yes.

9          THE COURT:  Did the translator explain to her or do

10   you want to translate?  She's not in the case anymore.

11         MR. LI:  Yes.  She understands English a little bit

12   so she understands that she's no longer liable.

13         THE COURT:  Okay.  All right.  That's it.  Thank you

14   very much.

15         MR. CLARK:  Thank you, Your Honor.

16         MR. LI:  Thank you, Your Honor.

17         THE COURT:  Take care.  Have a good weekend.

18   (Proceedings concluded at 12:50 p.m.)

19                       *  *  *  *  *  *

20

21

22

23

24

25

77

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                                    _____

6                                              Mary Greco

7  Dated:   December 6, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25